890 P.2d 1167

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**James E. GAYLORD, Defendant–Appellant.**

No. 15878.

Supreme Court of Hawai'i.

March 14, 1995.

James E. Gaylord, on the briefs, defendant-appellant, pro se.

Mark R. Simonds, Deputy Pros. Atty., on the briefs, Wailuku, Maui, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

In these consolidated appeals,[1] the defendant-appellant James Gaylord challenges his convictions of two counts of theft in the first degree and one count of theft in the second degree, as well as the resulting amended sentence—a mix of concurrent and consecutive indeterminate terms of imprisonment totalling fifteen years and a tripartite restitution order in the aggregate amount of $122,248.95—imposed on him by the trial court. Although Gaylord, acting *pro se* on appeal, raises twenty-nine points of error in his opening brief and seven more in his supplemental opening brief, only two issues[2] war-

---

1. By order dated June 22, 1992, this court consolidated Nos. 15877 and 15878 under No. 15878. By order dated November 30, 1992, we consolidated Nos. 15878, 16532, and 16538 for briefing and disposition under No. 15878.

2. After full and thorough consideration, and based on a review of the entire record before us, we hold that Gaylord's remaining points of error on appeal are without merit.

rant analysis in this opinion: (1) whether Hawai'i Revised Statutes (HRS) § 708–830(6)(a) (1985),[3] pursuant to the substantive provisions of which he was convicted of the two counts of theft in the first degree, in violation of HRS § 708–830.5 (Supp.1991),[4] is unconstitutionally vague and/or overbroad; and (2) whether the trial court abused its discretion in sentencing Gaylord to consecutive terms of imprisonment for the sole purpose of allowing the Hawai'i Paroling Authority "full control/authority to collect the full payment of restitution."[5]

We resolve the first issue in the negative and the second in the affirmative. Accordingly, we affirm Gaylord's amended judgment of conviction, vacate his amended sentence, and remand the matter to the circuit court for resentencing.

## I. BACKGROUND

The theft charges against Gaylord, all of which were tried together, arose out of his conduct as an attorney licensed by this court and engaging in the practice of law in Lahaina, Maui. We now address the circumstances underlying the charges, as reflected in the record, and the events that followed.

### A. Cr. No. 90–0085 (Nyen)

Donald L. Nyen, a citizen of Canada residing on the island of Maui, retained Gaylord to represent him in a transaction involving the sale of a parcel of Canadian land. Without turning over the sale proceeds to Nyen, Gaylord traveled to the mainland, where he allegedly became ill for a few days. Fearing "intense embarrassment and pressure" if he were to return to Maui, and dreading criminal prosecution for mishandling clients' matters, he disappeared and remained incommunicado from June 1989 to March 1990.

After being indicted by a Maui grand jury and returning to Hawai'i for trial, the jury found that Gaylord was legally obligated to Nyen in the amount of the sale proceeds—specifically, $47,248.95—and, on September 9, 1991, convicted him of theft in the first degree for having dealt with Nyen's funds as his own and failing to make a required payment or disposition of property, the value of which exceeded $20,000.00, in violation of HRS §§ 708–830(6)(a)[6] and 708–830.5.[7]

### B. Cr. No. 90–0261 (Count One) (Singh)

As a real estate commissioner, Gaylord was obligated to oversee the foreclosure of the property of Sattie Singh. After the req-

---

3. HRS § 708–830 (1985) provides in relevant part:

    **Theft.** A person commits theft if he does any of the following:

    . . . .

    (6) Failure to make required disposition of funds.

    (a) He intentionally obtains property from anyone upon an agreement, or subject to a known legal obligation, to make specified payment or other disposition, whether from the property or its proceeds or from his own property reserved in equivalent amount, and deals with the property as his own and fails to make the required payment or disposition. . . .

4. As originally enacted in 1986, see 1986 Haw. Sess.L.Act 314, § 63 at 624, HRS § 708–830.5 provided:

    **Theft in the first degree.** (1) A person commits the offense of theft in the first degree if the person commits theft of property, the value of which exceeds $20,000.

    (2) Theft in the first degree is a class B felony.

HRS § 708–830.5 was further amended in 1992, see 1992 Haw.Sess.L.Act 289, § 1 at 745, and

1993, see 1993 Haw.Sess.L.Act 14, § 1 at 24, but the amendments are not relevant to our analysis; in any event, they became effective after Gaylord's commission of the offenses in question.

    Class B felonies are punishable, inter alia, by an indeterminate ten-year term of imprisonment. HRS § 706–660(1) (Supp.1992).

5. We recognize that Gaylord neither objected in the circuit court nor challenged per se on appeal that portion of his sentence involving the means by which restitution was to be made. "[A]lthough points of error not raised on appeal in accordance with Hawai'i Rules of Appellate Procedure (HRAP) 28(b)(4) (1993) will ordinarily be disregarded, this court, at its option, may notice a plain error not presented. HRAP 28(b)[.]" State v. Schroeder, 76 Hawai'i 517, 532, 880 P.2d 192, 207 (1994). See also State v. McGriff, 76 Hawai'i 148, 155, 871 P.2d 782, 789 (1994). In light of our disposition of Gaylord's appeal, and in order to avoid potential plain error at resentencing, we choose to address the matter at this time.

6. See supra note 3.

7. See supra note 4.

uisite auction, Gaylord obtained possession of a deposit from the buyers in the amount of $70,000.00, which he was legally obligated to pay to Singh. Instead of doing so, however, Gaylord absconded to the mainland. On September 9, 1991, following indictment, the jury convicted him of theft in the first degree, likewise in violation of HRS §§ 708–830(6)(a) and 708–830.5, for failing to make a required payment or disposition of funds.

### C. *Cr. No. 90–0261 (Count Two) (Kinsela)*

Susan Kinsela, a resident of Kaua'i, retained Gaylord to represent her with respect to various legal matters after Gaylord had served as her court-appointed counsel in connection with a theft that she had allegedly committed at a Maui condominium. (The charge was later withdrawn.) The matters included a civil lawsuit that Kinsela filed, *inter alia,* against the homeowners' association of the condominium, the Maui Police Department, the Maui County Prosecutor's Office, and the Maui and O'ahu Community Correctional Centers. In the course of his representation, Gaylord requested and received from Kinsela a payment of $5,000.00 as part of their retention agreement. After making the payment, Kinsela discovered that Gaylord had left the state without performing any work on her case. Pursuant to the same indictment as that involving the Singh matter, on September 9, 1991, the jury convicted Gaylord of theft in the second degree, in violation of HRS §§ 708–830(2) (1985)[8] and 708–831(1)(b) (Supp.1991),[9] for having obtained or exerted control over Kinsela's property through deception.

### D. *Subsequent Absconding And Trial*

Having departed from Maui with what remained of Nyen, Singh, and Kinsela's monies,

Gaylord proceeded to travel across the mainland, purchasing several automobiles, assuming the identity of a deceased person, and making a false passport application. He was eventually apprehended by federal law enforcement agents and served a federal sentence for passport fraud before he was brought to trial in the second circuit court on the theft charges that underlie this appeal.

### E. *Sentencing*

Following Gaylord's convictions, his sentencing hearing was originally scheduled to take place on November 6, 1991, but was later continued to December 9, 1991. In a series of memoranda filed with the trial court, Gaylord proposed that he be sentenced to three five-year concurrent terms of probation, subject, *inter alia,* to the condition that he make restitution to Nyen, Singh, and Kinsela. In substance, Gaylord articulated his position as follows:

> [T]he defendant believes that he should be given an opportunity to make restitution while on probation.... [T]hose who lost money because of [his] criminal conduct ... would receive no benefit from a term of imprisonment and would benefit from a program of restitution.
>
> ....
>
> ... [I]t is clear to any reasonable person that a period of imprisonment would make it unlikely that the defendant could successfully make restitution
>
> ....
>
> A sentence of probation requiring the defendant to make restitution would be an appropriate alternative to a sentence of imprisonment.... Defendant believes

---

8. HRS § 708–830(2) provides that a person commits theft if he or she "obtains, or exerts control over, the property of another by deception with intent to deprive [the other] of the property."

9. As of 1987, HRS § 708–831 provided in relevant part:

    **Theft in the second degree.** (1) A person commits the offense of theft in the second degree if the person commits theft:

    ....

    (b) Of property or services the value of which exceeds $300[.]

    ....

(2) Theft in the second degree is a class C felony.
1987 Haw.Sess.L.Act 176, § 2 at 394. HRS § 708–831 was further amended in 1990, *see* 1990 Haw.Sess.L.Act 28, § 3 at 35–36, and 1992, *see* 1992 Haw.Sess.L.Act 54, § 2 at 83, but the amendments are not relevant to our analysis; in any event, they became effective after the commission of the offense in question.

Class C felonies are punishable, *inter alia,* by an indeterminate prison term of five years. HRS § 706–660(2) (Supp.1992).

that he can make full restitution within a reasonably short time if he is sentenced to time served [10] and probation.

... Imprisonment would cost the State of Hawai'i a substantial sum of money and would make it impossible for the defendant to pay restitution.

In its sentencing memorandum, the prosecution took the position that, in light of the nature and circumstances of the offenses and Gaylord's history and characteristics, Gaylord should be sentenced to indeterminate prison terms of ten years (Cr. No. 90–0085), ten years (Count One of Cr. No. 90–0261), and five years (Count Two of Cr. No. 90–0261), all to run consecutively pursuant to HRS § 668.5 (Supp.1992).[11]

Gaylord's continued sentencing hearing commenced, as scheduled, on December 9, 1991. At the outset, the deputy prosecuting attorney (DPA) called Georgina Yuen, the chairperson of the Hawai'i Paroling Authority, as a witness, whereupon the following colloquy ensued:

Q [by the DPA] ... [Y]ou are acquainted with the procedures of the [Hawai'i] Paroling Authority, and the way parole is administered; is that right?

A [by Yuen] Yes, I was a part-time member for six years prior to assuming the chairmanship this past July.

Q ... [I]f consecutive sentences were available, would it make a difference at all with a person receiving consecutive sentencing [ ] when it comes to restitution?

For instance, hypothetically, if ... it were possible to sentence a person to 20 years in terms of two 10 year consecutive ... terms ..., as opposed to two ten year terms concurrently, does that make any difference as to how the [Hawai'i] Paroling Authority could manage restitution with respect to that person?

A The policy of the [Hawai'i] Paroling Authority is that a person does not receive an early discharge from a sentence until restitution has been paid in full.

Q I see.

A So this would allow the courts or the Paroling Authority to have a longer term under which collection can be made.

. . . . .

Q Okay. Now, let me shift this. As far as the Paroling Authority is concerned, if a person were on parole ... [and] had to make approximately $122,000 in restitution, is it correct, then, that in a ten year period, the Paroling Authority would be seeking restitution of approximately a thousand dollars a month?

A That's correct.

Q Okay. Now, if a person had only a ten year sentence, after the expiration of that ten year sentence, under the jurisdiction of the Paroling Authority, would the Paroling Authority have an ability to collect any further moneys from that person?

A No, the Paroling Authority would not.

. . . .

Q Okay. Consequently, a longer period of time would ... allow the Paroling Authority more time to collect?

A Yes, it would.

. . . .

Q In your experience, has the ... [Hawai'i] Paroling Authority in fact been put in a ... better position, because of consecutive sentencing, to obtain restitution that they would not have been able to ... had it not been ... consecutive? Does any case come to mind?

A There have been instances in the First Circuit Court where the judges have put on the record the fact that they are giving a consecutive sentence purely for restitution purposes.

At sentencing, they place it on the record that they do not expect the defendant to serve additional time incarcerated because of the consecutive sentence, but wish to have this person under the jurisdiction of the criminal justice system for a longer period of time, so that the victims can be paid off.

Q I see.

10. Gaylord apparently served approximately ten months of pretrial incarceration.

11. See infra at 147, 890 P.2d at 1187.

A  A particular case that comes to mind is a woman that received, with consecutive sentences, a sentence of 38 years. And the judge placed on the record the fact that they did not expect ... this woman to serve anywhere near that 38 years, but wanted to allow this woman 38 years in which to pay the—I think it was some $300,000 in restitution.

Q  Yes.

A  That's the case that comes to mind.

Q  And that made it a more manageable amount, too, over that period of time; is that correct?

A  Well, she hasn't started to pay the restitution yet.

Q  Okay. Now, also, in your experience, are you aware of any cases of attorneys actually being sentenced to prison for stealing funds from their clients?

A  Yes, I am. On the Big Island an attorney was sentenced to a five year sentence for theft of client funds.

Q  All right. And the amount in question?

A  Approximately $165,000 documented.

Based on Yuen's testimony, the DPA made the following recommendation to the trial court during Gaylord's continued sentencing hearing on December 13, 1991:

[By the DPA:] ... [W]hat the State is seeking ... is consecutive sentencing.

The point is that the moneys that are sought for restitution—$47,000 for Mr. Nyen, $5,000 for the Kinselas, and $70,000 for Mrs. Singh—that's over $120,000. Actually about $122,000. Those are the amounts that are sought.

... [T]he point is—and the point of Mrs. Yuen's testimony was—that in order to have any chance at recovery, it's got to be for as long as possible.

. . . .

Because once that time is up, whatever that time be, the defendant walks out, and he's no longer under obligation to anyone—at least through the criminal justice system—to make any payment at all.

And for that reason, your Honor, we think that the 25 years that the State is seeking—10 for Theft in the First Degree, 10 for another Theft in the First Degree, and 5 for Theft in the Second Degree—that in terms of a 25 year consecutive sentence, this will allow the [Hawai'i] Paroling Authority ... the most opportunity and flexibility to try to obtain the $122,000 that is in fact due and owing for restitution in just this case.

As the Court is aware ..., the defendant's criminality and conduct extends beyond that.... [T]here were a lot more claims that were made, to the tune of approximately $246,000, and a lot more individuals that were affected. But the three that are before this Court totalled $122,000.[12]

At the conclusion of argument by the parties, the trial court imposed the following oral sentence from the bench:

The defendant stole from his clients, absconded with his clients' funds. But what is more, the method and the timing that he ... used in obtaining these funds from his clients, his flight from Maui to the mainland with these funds, the subsequent assumption of the name and identity of a dead man, making false application for a passport, all of these things reveal a deliberate, long thought-out, cunning scheme of theft, which was executed with considerable planning and forethought, based upon the facts and circumstances of this case.

From the presentence report,[13] the memoranda filed by both the State and the defendant, and the argument heard today,

12. Although the issue has not been raised, we note that a trial court may neither enhance a defendant's sentence based on an aggravating factor not established by the evidence nor punish a defendant for an uncharged crime in the belief that it too deserves punishment. *State v. Valera,* 74 Haw. 424, 439–40, 848 P.2d 376, 383, *reconsideration denied,* 74 Haw. 650, 853 P.2d 542 (1993); *State v. Nunes,* 72 Haw. 521, 526, 824 P.2d 837, 840 (1992); *State v. Tachibana,* 67

Haw. 573, 580, 698 P.2d 287, 293 (1985). There is no indication in the record that the trial court did so in this case.

13. Despite being given the opportunity to do so, Gaylord stated at his sentencing hearing that he did not wish to controvert any of the factual allegations contained in the presentence report.

the Court believes that this is not an appropriate case for probation.

To place Mr. Gaylord on probation, with a promise of restitution, fails to impress upon him the seriousness of his crimes. Accordingly, the Court will sentence the defendant ... under the following terms and conditions: First, the defendant is ordered to make restitution to the victims of his crimes.

The total amount of restitution, which will be installment payments, and the method of payments, is to be determined by the Paroling Authority. Secondly, in Case No. 90–0085, the defendant, having been convicted of Theft in the First Degree, is hereby sentenced to a term of imprisonment of five years.

On Count One of Case No. 90–0261, the defendant, having been convicted of Theft in the First Degree, ... is sentenced to a term of imprisonment of five years. On Count Two of Case No. 90–0261, the defendant, having been convicted of Theft in the Second Degree, ... is sentenced to a term of imprisonment of five years.

It is ordered that the defendant be given credit for time served while awaiting trial on these charges. The jail sentences imposed herein shall run consecutively and not concurrently.

*In ordering consecutive rather than concurrent prison sentences, the Paroling Authority is advised that it is not the intent of this Court that the defendant be imprisoned for an extended or enhanced period of time.*

*Rather, it is the intent of this Court that jurisdiction and control over the defendant be continued for a period of 15 years to see to it that the defendant makes full restitution, and that he shall not profit from his crimes.*

. . . .

The defendant has stated, in effect, that he is willing to make restitution to his victims, but only upon his own terms. Placing the defendant within the continued jurisdiction of the Paroling Authority would give the defendant ... a proper

incentive to make a good faith effort on restitution.

(Emphasis added.)

After the parties called the trial court's attention to the correct statutory prison term for a class B felony [14] and the need for specificity in the imposition of an order of restitution, the court amended the sentences relating to the two first degree theft convictions from five to ten years, the consecutive sentences thus aggregating twenty-five years. The court further ordered restitution in the sum of $47,248.95 on behalf of Nyen, $70,000 on behalf of Singh, and $5,000 on behalf of Kinsela. Finally, the court reiterated that its imposition of consecutive sentences was calculated "merely" to accord the paroling authority continuing control and supervision over Gaylord.

On December 13, 1991, the trial court entered a written judgment of conviction and sentence consistent with its oral ruling. In particular, the written judgment stated on its face that "[p]ayment of the restitution shall be in such manner as may be determined by the [Hawai'i Paroling Authority]" and that:

All terms of imprisonment herein [are] to run consecutively with each other for a total of 25 years, credit [to be] given for time served. The Court's intent of [sic] imposing consecutive terms of imprisonment is not for enhancement and/or extended terms[,] but to allow the [Hawai'i Paroling Authority] full control/authority to collect the full payment of restitution.

Pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 35, Gaylord filed a timely motion to "modify" his sentence either: (1) to a term of probation conditioned upon restitution; or (2) to (a) an indeterminate five-year prison term as to the second degree theft conviction, (b) two indeterminate ten-year prison terms as to the first degree theft convictions, to be served concurrently with each other but consecutively to the five-year prison term, and (c) "[s]pecific instructions to the parole board that for parole purposes the sentence be treated as a five year sentence."

Gaylord's HRPP 35 motion came on for hearing before the trial court on March 11,

14. *See supra* note 4.

1992. The relevant portion of the transcript reads as follows:

THE COURT: You ... mention ... the policy ... [of HRS §] 706–620, that was amended? [15]

MR. GAYLORD: Yes.

THE COURT: So that the ... public policy of the State was that [in] sentencing, punishment is a substantial factor?

MR. GAYLORD: Yes, I am aware of that.

THE COURT: It's therefore, when you ask the question how you spend your time—

MR. GAYLORD: Yes.

THE COURT: *It was the judgment of this Court that you do spend some time in prison as punishment.*

MR. GAYLORD: I am aware of that.

THE COURT: *And that you do spend a substantial portion of your life making restitution.*

MR. GAYLORD: Yes.

THE COURT: Now, in your memo, ... you ask the Court to modify your sentence to a term of probation. The Court will modify the sentence as follows: Five years on the Theft II count, 10 years on the Theft I count[s] running concurrent[ly] to each other but consecutively to the five years on the Theft II count.

[You request] further instructions to the parole board for parole purposes [that the sentence] is to be treated as a five-year sentence. The Court cannot do—*that's not within the power of this Court to instruct the parole board on these matters; isn't that true?*

MR. GAYLORD: As I understand, the Court can really say anything it wants.

THE COURT: But *I cannot instruct the parole board—*

MR. GAYLORD: *Yes, that's true. The Court doesn't have any authority to direct the parole board to do anything. [You] can make recommendations.*

THE COURT: I read your memos.

MR. GAYLORD: Yes.

THE COURT: I am not particularly impressed by your plan of restitution. *Your sources of restitution,* as I see it, even if true, *is [sic] speculative.*

MR. GAYLORD: I could speak to that.

THE COURT: I think you have stated them at length, and *I find them highly unlikely and highly speculative and unreliable.*

. . . .

If [I] rely on those now as an excuse, or as a reason for the Court to lessen its sentence, I find that to be unreasonable.

Now, Mr. Gaylord, how old are you?

MR. GAYLORD: I will be 52 in July.

THE COURT: Other than my original sentence, you will be in the jurisdiction of the parole authority until you are 75 years old.

MR. GAYLORD: 76.

THE COURT: Taking that matter into consideration, I will grant the motion to reduce the sentence to this extent. . . . I will deny your motion for a term of probation. I will grant you this: Five years on the count that the sentence originally posed by this Court be amended so as you serve five years on the Theft II count, 10 years on each of the Theft I counts running concurrently with each other.

. . . .

THE COURT: But consecutive[ly] to the five year[ ] term on the theft second count as you suggest.

MR. GAYLORD: Yes.

THE COURT: Final request of [sic] specific instructions to the parole board for parole sentence [sic] of five years sentence to be denied.

(Emphasis added.)

On March 27, 1992, the trial court entered a written order memorializing its oral ruling and amending its December 13, 1991 judgment of conviction and sentence as follows:

In Cr. No. 90–0085(3), Theft in the First Degree[,] the Defendant shall be sentenced

---

15. The trial court was apparently referring to HRS § 706–606, as amended in 1986. *See* 1986 Haw.Sess.L.Act 314, § 15 at 599–600. *See infra* at 41–44.

to a maximum indeterminate sentence of ten (10) years imprisonment.

In Cr. No. 90–0261(1), Count One, Theft in the First Degree, the Defendant shall be sentenced to a maximum indeterminate sentence of ten (10) years imprisonment.

In Cr. No. 90–0261(1), Count Two, Theft in the Second Degree[,] the Defendant shall be sentenced to a maximum indeterminate sentence of five (5) years imprisonment.

The terms of imprisonment for Cr. No. 90–0085(3) and Count One of Cr. No. 90–0261(1) shall run concurrently with each other for a total of ten (10) years for those counts.

The term of imprisonment for Count Two of Cr. No. 90–0261(1) shall run consecutively with the terms of imprisonment for Cr. No. 90–0085(3) and Count One of Cr. No. 90–0261(1) for a total of fifteen (15) years imprisonment for all counts.

All other matters contained in the Judgment [of] Guilty Conviction and Sentence filed in the above-entitled matters on December 13, 1991 not inconsistent with this order remain as originally ordered.

Gaylord timely appealed to this court from his amended judgment of conviction and sentence.

## II. *DISCUSSION*

### A. *HRS § 708–830(6)(a) Is Neither Unconstitutionally Vague Nor Overbroad.*

Gaylord urges that HRS § 708–830(6)(a) [16] is constitutionally defective on two grounds. First, Gaylord contends that the statute is vague because it fails to "give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct." By way of example, Gaylord suggests that "[a]lmost every person seeking the protection of the federal bankruptcy laws would be in violation of [the statute] under most reasonable readings[.]" Second, Gaylord maintains that HRS § 708–830(6)(a) is overbroad because "it sweeps so broadly as to include constitutionally protected conduct as well as unprotected conduct." In this connection, Gaylord explains that

the charging statute could be applied to a wide range of actions which the legislature did not mean to criminalize. For example, a person purchasing a refrigerator from Sears Roebuck subject to a conditional sales contract who fails to make the "specified payment" could be prosecuted under the subject charging statute. Likewise, in cases of business failures ..., the owners ... could [be] prosecuted under the ... terms of the subject charging statute.

Gaylord's constitutional challenges are worthy of discussion. Accordingly, we analyze his claims.

### 1. *Elements of the offense*

In order to determine the constitutionality of a statute, it is useful initially to place it in proper context. We therefore begin with the observation that a person commits the offense of theft by failure to make required disposition of funds, in violation of HRS § 708–830(6)(a), if: (1) the person "intentionally obtains property from anyone upon an agreement, or subject to a known legal obligation, to make [a] specified payment or other disposition, whether from the property or its proceeds or from [the person's] own property reserved in [an] equivalent amount"; and (2) the person "deals with the property as [the person's] own"; and (3) the person "fails to make the required payment or disposition."

"HRS § 701–114(1)(a) and (b) (1985) requires proof beyond a reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense." Moreover, HRS § 702–204 (1985) provides in relevant part that "a person is not guilty of an offense unless [the person] acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." Finally, HRS § 702–207 (1985) provides that "[when] the definition of an offense specifies the state of mind sufficient for the commission of

---

16. *See supra* note 3.

that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears."

*State v. Kupau,* 76 Hawaiʻi 387, 390, 879 P.2d 492, 495 (1994) (quoting *State v. Chung,* 75 Haw. 398, 411, 862 P.2d 1063, 1070 (1993)) (citation omitted) (some brackets and internal quotation marks deleted). *See also In re Doe, Born on January 5, 1976,* 76 Hawaiʻi 85, 92, 869 P.2d 1304, 1311 (1994).

■ Inasmuch as the *intent* to obtain property from another upon an agreement, or subject to a known legal obligation, to make a specified payment or other disposition, whether from the property or its proceeds or from the actor's own property reserved in an equivalent amount, must be proved in order to establish the offense of theft, in violation of HRS § 708–830(6)(a), and no contrary purpose "plainly appears" on the face of the statute, *see* HRS § 702–207, it therefore follows that "intent" is the requisite state of mind for each of the elements set forth in HRS § 708–830(6)(a).

Accordingly, there were four material elements of the offense of theft, as prohibited by HRS § 708–830(6)(a) and alleged in the indictments against Gaylord, each of which the prosecution was required to prove beyond a reasonable doubt in order to establish guilt. These four elements were: (1) that Gaylord obtained property upon agreements, or subject to known legal obligations, to make specified payments or other dispositions to Nyen and Singh, respectively, whether from the property or their proceeds or from Gaylord's own property reserved in equivalent amounts; (2) that Gaylord dealt with the property as his own; (3) that Gaylord failed to make the required payments or

dispositions to Nyen and Singh; and (4) that Gaylord did so intentionally.[17]

Having placed HRS § 708–830(6)(a) in context, we turn directly to Gaylord's constitutional claims.

### 2. *Standard of review*

■ When confronted with a constitutional challenge of a penal statute on the grounds of vagueness or overbreadth, we apply a number of principles on appeal. First,

[t]he constitutionality of a statute is a question of law which is reviewable under the right/wrong standard. Additionally, where it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest, and unmistakable.

*State v. Lee,* 75 Haw. 80, 90–91, 856 P.2d 1246, 1253 (1993) (citations omitted) (internal quotation marks, ellipsis points, and brackets deleted).[18] *See also Biscoe v. Tanaka,* 76 Hawaiʻi 380, 382, 878 P.2d 719, 721 (1994); *Pray v. Judicial Selection Comm'n,* 75 Haw. 333, 340, 861 P.2d 723, 727 (1993); *Sifagaloa v. Board of Trustees of Employees' Retirement Sys.,* 74 Haw. 181, 191, 840 P.2d 367, 371 (1992); *State v. Kam,* 69 Haw. 483, 496, 748 P.2d 372, 380 (1988).

■ Second, we construe penal statutes narrowly, considering them in the light of precedent, legislative history, and common sense. " '[W]hatever may be said of the rule of strict construction, it cannot provide a substitute for common sense, precedent, and legislative history. We cannot construe [the

---

17. Of course, in order to establish the offenses of theft in the first degree in violation of HRS § 708–830.5 (Supp.1991), the prosecution was required to prove a fifth material element beyond a reasonable doubt, namely, that the value of the property applicable to each count exceeded $20,000.00. *See supra* note 4.

18. "Such presumptive constitutionality does not apply for purposes of equal protection analysis in the case of statutes, which on their face classify

on the basis of suspect categories such as race or sex. *See Baehr v. Lewin,* 74 Haw. [530, 571–72], 852 P.2d 44, 63–64, *reconsideration [granted in part],* 74 Haw. 650, 875 P.2d 225 (1993)." *State v. Lee,* 75 Haw. 80, 91 n. 4, 856 P.2d 1246, 1254 n. 4 (1993). However, HRS § 708–830(6)(a) does not contain any suspect categories, and Gaylord does not allege that its application to him, as such, constitutes a denial of the equal protection of the laws.

statute] in a vacuum. Nor can we read it as Baron Parke would read a pleading.' " *State v. Taylor*, 49 Haw. 624, 634, 425 P.2d 1014, 1021 (1967) (quoting *United States v. Standard Oil Co.*, 384 U.S.' 224, 225–26, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492 (1966)).

■ Third, where possible, we will read a penal statute in such a manner as to preserve its constitutionality.

"To accord a constitutional interpretation of a provision of broad or apparent unrestricted scope, courts will strive to focus the scope of the provision to a narrow and more restricted construction....

"Provisions of a penal statute will be accorded a limited and reasonable interpretation under this doctrine in order to preserve [its] overall purpose and to avoid absurd results."

*Id.* at 635, 425 P.2d at 1021 (quoting *Territory v. Wong*, 40 Haw. 257, 259–60 (1953)) (internal statutory citation omitted).[19] Put differently, " '[a] statute will not be held unconstitutional by reason of uncertainty if any sensible construction embracing the legislative purpose may be given it. Mere difficulty in ascertaining its meaning, or the fact that it is susceptible to interpretation will not render it nugatory.' " *Id.* (quoting *State v. Prevo*, 44 Haw. 665, 679–80, 361 P.2d 1044, 1052 (1961)) (internal case citation omitted). *See also In re Doe, Born on January 5, 1976*, 76 Hawai'i at 93, 869 P.2d at 1312 ("When possible, we interpret enactments of the [l]egislature contained in the criminal code so as to uphold their constitutionality." (citations omitted)).

### 3. *Vagueness*

■ In *Lee, supra*, we recently synthesized our conceptual approach to constitutional challenges of penal statutes on vagueness grounds as follows:

To date, this court has treated claims that a criminal statute is unconstitutionally

vague as essentially facial attacks, subject to the following standard:

Due process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudging guilt, or the statute is void for vagueness. *State v. Kameenui*, 69 Haw. 620, 621, 753 P.2d 1250, 1251 (1988). Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct. *Id.*

*State v. Tripp*, 71 Haw. 479, 482, 795 P.2d 280, 282 (1990). This standard is essentially indistinguishable from the applicable standard under federal law. Thus we have so far not departed from federal constitutional law in the area of "void for vagueness" challenges to criminal statutes.

... [U]nder the applicable federal law, a criminal statute is void for vagueness unless: it 1) "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he [or she] may act accordingly[;]" and 2) "provide[s] explicit standards for those who apply" the statute, in order to avoid "arbitrary and discriminatory enforcement" and the delega[tion] of basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis[.]" *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). \

*Lee*, 75 Haw. at 92–93, 856 P.2d at 1254. *See also Kam*, 69 Haw. at 487, 748 P.2d at 375; *State v. Petrie*, 65 Haw. 174, 175–76, 649 P.2d 381, 383 (1982) (per curiam); *State v. Kaneakua*, 61 Haw. 136, 138–39, 597 P.2d 590, 592 (1979). The approach as summarized in *Lee* applies equally to our analysis of Gaylord's assault on HRS § 708–830(6)(a).

■ As a further preliminary matter, we note that "[p]enal statutes are to be strictly construed. However, the strict con-

---

**19.** *Cf.* HRS § 701–104 (1985), which provides: **Principles of construction.** The provisions of this [Hawai'i Penal] Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of the words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.

struction rule does not permit the court to ignore legislative intent, nor require the court to reject that construction that best harmonizes with the design of the statute or the end sought to be achieved." *State v. Ortiz,* 74 Haw. 343, 352, 845 P.2d 547, 552, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993) (citations omitted). Thus, although not direct evidence of legislative intent, we look to the commentary to the Hawai'i Penal Code (HPC), HRS Title 37, "as an aid in understanding" the terms of HRS § 708–830(6)(a). *See* HRS § 701–105 (1985) ("The commentary accompanying ... [the Hawai'i Penal] Code ... may be used as an aid in understanding [its] provisions ..., but not as evidence of legislative intent."); *cf. State v. Alo,* 57 Haw. 418, 426–27, 558 P.2d 1012, 1017 (1976) (Hawai'i Penal Code commentary, while not evidence thereof, "is nevertheless expressive of ... legislative intent"), *cert. denied,* 431 U.S. 922, 97 S.Ct. 2193, 53 L.Ed.2d 235 (1977).

The commentary to HRS §§ 708–830 to 708–833, which explicates the HPC's comprehensive philosophical approach to theft offenses, states in relevant part:

> The [HPC] follows the Model Penal Code and other recent revisions in consolidating under a single offense the traditionally distinct common-law crimes of larceny, embezzlement, obtaining by false pretenses, obtaining by trick or device, fraudulent conversion, cheating, extortion, and blackmail. Such consolidation is desirable both from the standpoint of conceptual simplicity and to eliminate pointless procedural obstacles. Nonetheless, the numerous and diverse circumstances involved in individual theft offenses require that the general offense be differentiated by degrees and that the severity of the penalties authorized be correlated with the aggravating circumstances presented by the form and object of the offense. Accordingly, [HRS] § 708–830 provides that a person commits theft if he [or she] engages in any

of the modes of conduct specified therein, and [HRS] §§ [708–830.5] through 833 divide theft into ... degrees differentiated by the mode of the conduct involved and the object of the theft.

> It should be noted that *in all theft offenses, the requisite mental state is intent to deprive the owner of the value of property or services.* Although in most instances the actor will intend to appropriate the value of property or services for his [or her] own benefit, that is not the gravamen of the offense.

(Emphasis added and footnote omitted).[20] *Cf. State v. Brighter,* 62 Haw. 25, 608 P.2d 855 (1980) (intent to deprive another of his or her property is essential element of theft).

In particular, subsection (a) of HRS § 708–830(6), regarding "failure to make required disposition of funds,"

> makes it theft to obtain property from anyone upon an agreement or legal obligation to make a specified payment or disposition *and then to deal with the property, its proceeds, or a reserve fund from which payment was to be made, as the actor's own*[21] and to fail to make the required disposition. It is not necessary, under the [HPC], to identify the particular property, proceeds, or funds which the accused has appropriated and which he [or she] has in his [or her] possession: this avoids the common-law necessity of proof of the victim's continued constructive possession. *Courts have had difficulty in regarding this type of wrongful appropriation as theft because it arises out of a breach of a civil contractual obligation.*

Commentary to HRS §§ 708–830 to 708–833 (emphasis added).

As the foregoing commentary to the HPC suggests, the Model Penal Code and Commentaries (Official Draft and Revised Comments 1980) [hereafter MPC] contains a theft provision, of which HRS § 708–830(6)(a) is

---

**20.** Inasmuch as one of the material elements of HRS § 708–830(6)(a) is that the actor "deals with the [appropriated] property as his [or her] own," in addition to "fail[ing] to make the required payment or disposition," *see supra* note 3, intent "to appropriate the value of property" for

the actor's "own benefit," directly or indirectly, *is* an aspect of the gravamen of that particular form of theft.

**21.** *See supra* note 20.

an analogue.[22] Specifically, MPC § 223.8, entitled "Theft by Failure to Make Required Disposition of Funds Received," provides in relevant part:

> A person who purposely obtains property upon agreement, or subject to a known legal obligation, to make specified payment or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he deals with the property obtained as his own and fails to make the required payment or disposition. . . .

MPC § 223.8 at 255.

Noting that MPC § 223.8 "is designed to bring within the law of theft certain situations that traditionally have occasioned difficulty," MPC § 223.8 comment (Background and Scope) at 255, the drafters of the MPC took pains to distinguish conduct within the penal reach of section 223.8 from that which is properly relegated to civil remedies:

> The problem arises whenever the actor's behavior arguably constitutes merely a breach of contract rather than a misappropriation of property of another. Section 223.8 recognizes that in some situations one who promises to make certain payments or other disposition of property should be punished for dealing with the property as his own. At the same time, *the section does not purport generally to substitute criminal prosecution for civil remedies under the law of contract.* The challenge, therefore, is to distinguish default that should be assimilated to theft from non-performance that should be left

to the traditional remedies for breach of contract.

*Id.* at 255–56 (emphasis added).

Accordingly, the drafters of the MPC emphasized that "[s]ection 223.8 must not be construed so broadly that a bright line between theft and breach of contract is obscured." *Id.* at 261. "The path," they observed,

> to avoiding . . . undue extensions of [s]ection 223.8 is to accord proper weight to the limitation embodied in the words "to be reserved," so that [s]ection 223.8 is deemed applicable only in cases of a promise to turn over property actually received in kind or an equivalent sum of money *specifically reserved in the sense that a trustee reserves a fiduciary account.*

*Id.* (emphasis added).

The quasi-fiduciary relationship between the offender committing theft by "failure to make required disposition of funds," on the one hand, and the victim of his or her offense, on the other, thus differentiates conduct that is not prohibited by the statute from that which is prohibited. Examples of what is *not* proscribed include (1) "honest insolvency . . . . [that is] so often a result of factors beyond the control of the individual," *Id.* at 259, (2) the "ordinary credit transaction" in which "an assessment of risks at some future date" is implicit, *id.*,[23] and (3) mere financial "mismanagement" resulting in bankruptcy. *Id.* at 263. However, a person *does* commit theft by failure to make required disposition of funds when, despite being a "mere[ ] conduit[ ]" for the transmission of money to persons designated," and having

---

22. We recently noted that "the Model Penal Code (MPC), as adopted at the 1962 annual meeting of The American Law Institute, was 'used by the Judicial Council of [Hawai'i] as the guide for the [HPC].' Sen.Stand.Comm.Rep. No. 599, in 1971 Senate Journal, at 1067." *In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 94–95, 869 P.2d 1304, 1313–14 (1994). "We therefore look to the MPC and its comments to inform our effort to glean the scope of" parallel statutes contained in the HPC. *Id.* at 95, 869 P.2d at 1314.

23. Typically the purchaser of goods "obtains" property by becoming the drawee-acceptor of a draft, drawn by the merchant in favor of the credit-card company as payee. If unauthorized use of the card is involved, or if forged or

stolen cards are used, [s]ection 224.6 [credit card fraud; *cf.* HRS §§ 708–8100 through 708–8106 (Supp.1992)] is adequate to handle the problem. If the actor intended from the beginning not to pay, [s]ection 223.3 [theft by deception; *cf.* HRS § 708–830(2), *supra* note 8] covers the situation. But if the actor is engaged in authorized use and simply cannot pay his bills, it is inappropriate to make him a thief; the risk that he cannot pay is a cost of doing business that credit-card companies should assume. The actor's conduct, moreover, does not reflect the kind of dereliction that can properly be condemned as theft. MPC § 223.8 comment (Background and Scope) at 261.

an "understood obligation[ ] ... at once to set aside assets that [are] sufficient to satisfy the obligation for which the money [is] entrusted," the person "use[s] the funds in any way for [his or her] own purposes." *Id.* at 259. Under such circumstances, "a proprietary use of the money should properly be regarded as theft, much as a guardian may be guilty of embezzlement when he commingles fiduciary funds with his own and reduces the account below the level of his fiduciary obligation in order to satisfy his personal financial needs." *Id.*

"A lawyer is ... in a fiduciary relationship with [his or her] client," being "a person having duties involving good faith, trust, special confidence, and candor towards another." *Black's Law Dictionary* 625 (6th ed. 1990).[24] As such:

> "The funds of a client or others held by an attorney must be kept inviolate and only the strictest rules of conduct will be applicable.... The attorney-client relationship involves the highest degree of trust and confidence. The duty of an attorney to the client must be discharged honorably and faithfully, governed by the most exacting principles of morality and justice.... Thus, in numerous cases, both in this jurisdiction and in others, the misappropriation of the funds of a client by an attorney has resulted in the immediate disbarment of the culpable attorney. [citations omitted]"

*Office of Disciplinary Counsel v. Johnson,* 62 Haw. 95, 97, 611 P.2d 993, 995 (1980) (per curiam) (quoting *Disciplinary Board v. Kim,* 59 Haw. 449, 453, 583 P.2d 333, 336 (1978)).

During the periods spanning Gaylord's two first degree theft offenses, his fiduciary duty relating to preserving the identity of his clients' funds and property were delineated by DR 9–102 of the Code of Professional Responsibility promulgated by this court.[25] DR 9–102, as amended effective September 22, 1983, provided in relevant part:

**Preserving Identity of Funds and Property of a Client**

(A) All funds of clients paid to a lawyer or a law firm in the State of [Hawaiʻi], other than advances for costs and expenses, shall be deposited in one or more identifiable bank or savings and loan association accounts maintained in the State of [Hawaiʻi] and no funds belonging to the lawyer or law firm shall be deposited therein[.]

. . . .

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

. . . .

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his clients regarding them....

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

Moreover, DR 1–102(A)(3) and (4) prohibited all licensed attorneys, including Gaylord, from engaging either in "illegal conduct involving moral turpitude" or in "conduct involving dishonesty, fraud, deceit, or misrepresentation."[26] Finally, as the "basis for disciplinary action when the conduct of a lawyer falls below the required minimum

---

24. *Black's Law Dictionary* (6th ed. 1990) further defines a "fiduciary" to include "[a] person or institution who manages money or property for another and who must exercise a standard of care in such management activity imposed by law or contract; *e.g.,* executor of estate; receiver in bankruptcy; trustee." *Id.* at 625. Obviously, an attorney acting as a court-appointed real estate commissioner, as Gaylord did in connection with .count I of Cr. No. 90–0261, is likewise a fiduciary.

25. Effective January 1, 1994, the Code of Professional Responsibility was replaced by the Hawaiʻi Rules of Professional Conduct (HRPC). DR 9–102 was transformed into HRPC Rule 1.15, which was identical. HRPC Rule 1.15 was substantially amended effective July 1, 1994.

26. Effective January 1, 1994, DR 1–102 was replaced by HRPC Rule 8.4. The comment on Rule 8.4 states, *inter alia,* that offenses involving "moral turpitude," for purposes of the rule, include offenses involving "dishonesty or breach of trust."

standards stated in the Disciplinary Rules," *see* Preliminary Statement to the Code of Professional Responsibility, Gaylord was charged as a matter of law with knowledge of the Code's provisions.

In light of the foregoing, we hold that HRS § 708–830(6)(a) describes with reasonable clarity the acts that it proscribes, provides fixed standards for adjudging guilt, and gives persons of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that they may choose between lawful and unlawful conduct. *See Lee,* 75 Haw. at 92, 856 P.2d at 1254. As we have noted, theft by failure to make required disposition of funds does not purport generally to substitute criminal prosecution for civil remedies under the law of contract. MPC § 223.8 comment (Background and Scope) at 255–56. Thus, HRS § 708–830(6)(a) does not criminalize "honest insolvency" that is beyond a debtor's control, "ordinary credit transaction[s]" in which future risk of nonpayment is implicit, or "mere financial mismanagement" resulting in bankruptcy. *Id.* at 259, 263. Accordingly, a person of ordinary intelligence (and, *a fortiori,* a licensed attorney) should know that HRS § 708–830(6)(a) does not criminalize the mere seeking of the protection of the federal bankruptcy laws and should have no difficulty in choosing between lawful and unlawful conduct.

By contrast, HRS § 708–830(6)(a) applies "only in cases of a promise to turn over property actually received in kind or an equivalent sum of money specifically reserved in the sense that a trustee reserves a fiduciary account." *Id.* at 261. Thus, the statute clearly proscribes the intentional use of property or funds in any way for a person's own purposes when the person intentionally fails to make a required disposition of funds under circumstances in which (1) he or she is a "mere conduit" for the transmission of property or money to other designated persons, and (2) he or she is subject to an understood obligation immediately to set aside assets that are sufficient to satisfy the obligation for which the property or money has been entrusted. *Id.* at 259. Accordingly a person of ordinarily intelligence (and, *a*

*fortiori,* a licensed attorney) should have a reasonable opportunity to know what conduct is criminalized by HRS § 708–830(6)(a).

Gaylord having failed to meet his burden of plainly, clearly, manifestly, and unmistakably showing unconstitutionality beyond a reasonable doubt, we hold that HRS § 708–830(6)(a) is not unconstitutionally vague.

### 4. Overbreadth

"The doctrine of overbreadth, although closely related to a vagueness claim, is distinct in that while a statute may be clear and precise in its terms, it may sweep so broadly that constitutionally protected conduct as well as unprotected conduct is included in its proscriptions." *Kaneakua,* 61 Haw. at 143, 597 P.2d at 594 (citations omitted). *See also Kameenui,* 69 Haw. at 623, 753 P.2d at 1252; *Kam,* 69 Haw. at 487, 748 P.2d at 375.

As was the case in *Tripp, supra,* Gaylord lacks standing to assert his overbreadth claim regarding HRS § 708–830(6)(a). "One who alleges that a statute is unconstitutionally overbroad, other than a statute affecting the freedom of expression, must be directly affected by the claimed overbroad aspects." *Tripp,* 71 Haw. at 483, 795 P.2d at 282. Put differently, "[a] person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally to others." *Kaneakua,* 61 Haw. at 144, 597 P.2d at 594 (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973)). First, it is incontrovertible that the theft statute at issue in this case in no way impinges upon anyone's freedom of expression, as protected by the first amendment to the United States Constitution and article I, section 4 of the Hawai'i Constitution. Second, the conduct for which Gaylord was convicted under HRS § 708–830(6)(a) did not involve—indeed, was worlds apart from—his hypothetical misapplications of the statute: the breach by a purchaser of a conditional sales contract with a commercial vendor or an owner's business failure resulting from insolvency. The simple fact is that Gaylord has no constitutional right to be a thief.

In any event, for the reasons discussed in section II.A.3 and 4 of this opinion, we hold that HRS § 708–830(6)(a) is not unconstitutionally overbroad. As we have demonstrated, the statute does not purport generally to substitute criminal prosecution for civil remedies under the law of contract, but rather is applicable only in cases of a promise to turn over property or money actually received in kind or equivalent sums of money specifically reserved in the sense that a trustee reserves a fiduciary account.

B. *The Circuit Court Committed An Abuse Of Discretion When It Sentenced Gaylord To Consecutive Indeterminate Terms Of Imprisonment, Despite Its Express Declaration That It Did Not Intend That Gaylord Actually Serve An Extended Or Enhanced Term, For The Sole Purpose Of Maximizing The Hawai'i Paroling Authority's Jurisdiction And Control Over Gaylord In Order To Ensure The Payment Of Restitution.*

Gaylord next contends, *inter alia*, that the trial court "erred when it failed to set aside [the] consecutive sentence imposed for the purpose of 'controlling' the payment of restitution." Quoting the trial court's stated rationale for the imposition of consecutive terms of imprisonment, set forth *supra* at 13, Gaylord makes the intuitive argument that "it can be assumed that if [he had been in a position to make] full restitution [forthwith,] his sentence would have been [prison] terms running concurrent[ly] with each other rather than consecutive[ly] to each other." [27] Gaylord then poses the rhetorical question: "Is it necessary to make any additional argument to establish that [his] sentence was based upon his economic status[?]"

The prosecution counters with the following argument:

27. It is apparent from Gaylord's argument that, for purposes of the point of error in question, he concedes *arguendo* that the trial court had the statutory authority to sentence him to an indeterminate term of imprisonment.

28. Insofar as the prosecution relies on *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), in support of its position, its reliance is misplaced. As the prosecution acknowledges, *Solem* "addressed the issue of proportionality of

The gravity of the offense[s] in the present case ... mandates the harshness of the penalty.... [Gaylord] abused a position of fiduciary trust in order to commit acts of theft.

. . . .

The trial court clearly imposed a sentence mandated [sic; presumably "authorized"] by the statutory authority set out in Chapter 706 of the [Hawai'i] Revised Statutes. As such, [Gaylord's] allegation is unsupported by the record below, as well as his arguments presented [on appeal].

. . . .

The total amount of restitution ordered by the trial court *should* be the actual loss or damage incurred by the victim[s]. *State v. Johnson*, 68 Haw. 292, 711 P.2d 1295 (1985). In the present case, [Gaylord] was ordered to pay restitution for all the stolen funds. However, [Gaylord] was not imprisoned based on only inability to pay restitution. [Gaylord's] contention is, therefore, without merit.

(Emphasis in original.) [28]

Accordingly, the question before us is whether the circuit court erred when it sentenced Gaylord to consecutive indeterminate terms of imprisonment, despite its express declaration that it did not intend that Gaylord *actually* serve an extended or enhanced prison term, *see supra* at 12–13, for the *sole* purpose of maximizing the Hawai'i Paroling Authority's jurisdiction and control over Gaylord so as to ensure the payment of the ordered restitution to Nyen, Singh, and Kinsela. *See id.* For the reasons set forth below, we answer the question in the affirmative.

1. *Standard of review*

"The authority of a trial court to select and determine the severity of a penal-

sentences under the Eighth Amendment." The eighth amendment to the United States Constitution prohibits, *inter alia*, the infliction of cruel and unusual punishments. Gaylord does not suggest, however, that his sentence is "cruel and unusual." As indicated *infra*, Gaylord's claim can be resolved on statutory grounds and therefore does not implicate constitutional considerations.

ty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." *State v. Valera,* 74 Haw. 424, 439, 848 P.2d 376, 383, *reconsideration denied,* 74 Haw. 650, 853 P.2d 542 (1993). In other words,

> while a sentence may be authorized by a constitutionally valid statute, its imposition may be reviewed for plain and manifest abuse of discretion.
>
> Admittedly, the determination of the existence of clear abuse is a matter which is not free from difficulty[,] and each case in which abuse is claimed must be adjudged according to its own peculiar circumstances. Generally, to constitute an abuse[,] it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Kumukau,* 71 Haw. 218, 227–28, 787 P.2d 682, 688 (1990) (citations and internal quotation marks omitted). *See also State v. Murray,* 63 Haw. 12, 25, 621 P.2d 334, 342–43 (1980).

■ In order to facilitate appellate review for abuse of a trial court's sentencing discretion, and "[w]henever a defendant is qualified for sentencing alternatives and the sentence imposed is unsatisfactory to the defendant, we strongly encourage and recommend that ... the sentencing court ... state its reasons for imposing the particular sentence." *State v. Lau,* 73 Haw. 259, 265, 831 P.2d 523, 526 (1992).

### 2. *Consecutive sentencing— general principles*

#### a. *Legislative evolution of the Hawai'i consecutive sentencing statute*

As originally enacted in 1972, the HPC addressed the option of concurrent versus consecutive sentencing in HRS § 706–668. HRS § 706–668 (1972), provided in relevant part: [29]

**Concurrent and consecutive terms of imprisonment.** (1) Except as provided in subsection (2), when multiple offenses of imprisonment are imposed on a person at the same time, ... the sentence or sentences imposed by the court *shall* be served concurrently.

(Emphasis added.) The commentary to HRS § 706–668 instructed that

> subsection (1) deprives the court of the power to mandate that the sentences imposed upon a defendant be served consecutively. While this is a slight departure from the restricted recognition accorded consecutive sentences by the [MPC], this [HPC] takes the position that the sections providing for extended terms of imprisonment [*see* HRS §§ 706–661 (1985), 706–662 (Supp.1992), and 706–664 (Supp.1992) ] more adequately and directly address the question of the need for extended incarceration of a multiple offender. To provide for consecutive sentences in addition to extended terms would generally serve no useful purpose....

(Footnote omitted.)

Thus, in its original form, HRS § 706–668 substantially adhered to the general sentencing model currently prescribed by the American Bar Association's *Standards for Criminal Justice Sentencing* (3d ed. 1994) [hereafter ABA Standards]. One of the global premises of the ABA Standards is articulated in Standard 18–2.4, entitled "Severity of sentences generally," which provides in relevant part:

> The legislature should ensure that maximum authorized levels of severity of sentences ... are consistent with rational, civilized, and humane values. Sentences authorized and imposed, taking into account the gravity of the offenses, should be no more severe than necessary to achieve the societal purposes for which they are authorized.

The commentary to Standard 18–2.4 elucidates its underlying policy as follows:

**29.** HRS § 706–668(2) (1972), relating to the sentencing of persons convicted of offenses committed while already imprisoned or during an escape from imprisonment, is not relevant to our analysis in this appeal. The subsection was repealed in 1982. 1982 Haw.Sess.L.Act 206, § 1 at 391.

The second sentence of the Standard sets forth a principle that can usefully be applied in the creation of sentencing policy and the imposition of specific sentences, regardless of the societal purposes a particular jurisdiction has decided to pursue: All impositions of punishment should be no more than necessary for the attainment of identified societal goals. It is generally accepted that it is wrong to inflict gratuitous harm; thus government ought to impose only the minimum criminal sanctions consistent with the public's aims. This is sometimes called the principle of parsimony in punishment. It is made applicable here to severity decisions made by legislatures, sentencing agencies, and the courts.

ABA Standards § 18–2.4 commentary at 29–30 (footnotes omitted).[30]

Standard 18–3.7, entitled "Convictions of multiple offenses," articulates a second global premise of the ABA Standards in relevant part as follows:

(b) For offenses that are part of a criminal episode,

. . . .

(ii) sentencing courts should not change the type of sanction or increase the severity of sentences for multiple offenses merely as a result of the number of counts or charges made from a single episode, and

(iii) . . . sentencing courts should impose sentences of a type of sanction and level of severity that take into account the fact that the separate offenses occurred as part of an episode.

(c) If multiple offenses are of a kind that is graded by the amount of money or property involved, sentencing courts should be authorized and guided to determine the appropriate sentence by treating the offenses as a single offense and measuring its gravity by cumulating the amounts of money or property in the separate offenses.

(d) Upon conviction of an offender for multiple offenses not within (b) or (c), the presumptive sentence should be derived by reference to the sentence appropriate for the most serious offense. If the court determines that an enhanced sentence is appropriate because of the other current offenses, the enhancement should ordinarily be determined as if the other current offenses were treated as part of the offender's criminal history or as factors aggravating the most serious offense.

The skeletal structure of Standard 18–3.7 is fleshed out in its commentary:

This Standard confronts one of the most difficult conceptual issues presented in the Standards as a whole: In cases where an offender has been convicted of multiple current offenses, how should an overall sentence be calculated? In the traditional practice of consecutive sentencing, it is possible to stack the penalties that would have been imposed for each offense considered separately. Such an additive approach can result in sentences of extraordinary harshness, however, and poorly tailored to serve consequentialist goals.[31] On

---

**30.** The spirit of Standard 18–2.4 has been embedded in modern criminology theory for over two hundred years. One pioneer expressed the "principle of parsimony in punishment" in this fashion:

The end of punishment . . . is no other[ ] than to prevent the criminal from doing further injury to society, and to prevent others from committing the like offence. Such punishments, therefore, and such a mode of inflicting them, ought to be chosen, as will make the strongest and most lasting impressions on the minds of others, with the least torment to the body of the criminal.

. . . .

. . . In general . . . , [t]he degree of the punishment, and the consequences of a crime, ought to be so contrived[ ] as to have the greatest possible effect on others, with the least possible pain to the delinquent. If there be any society in which this not a fundamental principle, it is an unlawful society. . . .

C. Beccaria, *An Essay on Crimes and Punishments* 43–44, 75–76 (1775) (The Legal Classics Library 1991 ed.) (emphasis in original).

**31.** For people who espouse teleological or consequentialist punishment philosophies, usually some version of utilitarianism, in which actions are justified by their results, "equality of suffering" by the offender is seldom a paramount aim; the justification must be expressed in terms of crime prevention or achievement of other desirable social ends through such processes as deterrence, incapacitation, and rehabilitation.

the other hand, the practice of concurrent punishment results in overlapping sentences for multiple counts, so that the most serious charge of current conviction determines the outside sentence severity. In some respects, the remaining counts are "free" as far as determination of the present sentence is concerned.

Standard 18–3.7 advocates an approach to all sentencings for multiple convictions that is neither consecutive nor concurrent. The theory running through the Standard is that multiple offenses normally ought to be punished more harshly than single offenses, but that mechanisms short of stacking should be used to evaluate their combined seriousness....

....

Criminal codes may define the gravity of certain offenses in terms of quantities of property or money. Often defendants are convicted of multiple charges of such offenses. Paragraph (c) recommends that sentencing courts be guided to aggregate the amounts of property or money in all of the counts and to impose a consolidated sentence based upon that aggregate. Circumstances may arise tending to show that a law enforcement agent delayed arresting a person committing a series of minor offenses until evidence had accumulated to warrant imposition of a relatively severe sentence through the principle of aggregating quantities. Sentencing courts may be cautioned to take such circumstances appropriately into account.

Paragraph (d) provides for cases in which multiple offenses cannot be grouped under the terms of paragraphs (b) or (c). The Standard recommends that a legislature ... should guide sentencing courts on the construction of consolidated sentences, using the most serious offense as a foundation and enhancing sentence for that offense by reference to the other offenses.[32]

This is preferable to sentencing separately for each offense and then seeking some principle to determine whether the sentences should be made consecutive or concurrent....

ABA Standards § 18–3.7 commentary at 71–74 (footnotes omitted).

Effective June 12, 1982, HRS § 706–668 was amended to provide in relevant part that "[w]hen multiple sentences of imprisonment are imposed on a person at the same time ..., the sentence or sentences imposed by the court *may be served concurrently or consecutively.*" 1982 Haw.Sess.L. Act 206, §§ 1, 3 at 391 (emphasis added). The purpose of the amendment was

to give judges *discretion* to sentence a person to a term of imprisonment to run concurrently or consecutively.

Presently, the law requires a judge to sentence a person to terms of imprisonment to run concurrently, giving no *discretion* to judges. This requirement negates the deterrent and punishment aspects of sentencing and in so doing fails to deter similar future behavior on the part of the particular individual involved. The [amendment] provides that judges have *discretion* to sentence a person to consecutive terms of imprisonment. Your committee feels that judges will exercise their *discretion* in invoking consecutive terms of imprisonment when appropriate as in instances where the defendant committed multiple or subsequent offenses.

Sen.Conf.Comm.Rep. No. 5–82, in 1982 Senate Journal, at 874 (emphasis added); Hse. Conf.Comm.Rep. No. 6–82, in 1982 House Journal, at 817 (emphasis added). *See* commentary to HRS § 706–668 ("Act 206, Session Laws 1982, amended this section to provide the court discretion to sentence a person to a term of imprisonment to run consecutively or concurrently."); *Kumukau,* 71 Haw.

---

N. Morris and M. Tonry, *Between Prison and Probation* 84 (1990) [hereafter *Between Prison and Probation* ]' *See also* ABA Standards § 18–2.1 commentary at 10 n. 2 ("Consequentialists seek to promote the prospective social good of reducing future crime. Retributivists find a different social end in the punishment of past criminal acts, even where no forward-looking benefits result.").

**32.** Arguably, such legislative "guidance" of sentencing courts currently appears in HRS §§ 706–661 (1985) ("Sentence of imprisonment for felony; extended terms"), 706–662 (Supp.1992) ("Criteria for extended terms of imprisonment"), and 706–664 (Supp.1992) ("Procedure for imposing extended terms of imprisonment").

at 225, 787 P.2d at 686 ("Prior to 1982, consecutive sentences were not authorized, but the legislature in amending the law to allow imposition of consecutive sentences stressed that courts must be allowed discretion in determining the appropriate sentence for any particular defendant.").

Thus, as amended, "HRS § 706–668 allow[ed], *without limitation,* the sentencing judge discretion to impose consecutive sentences whenever he or she [was] imposing multiple sentences." *State v. Tyquiengco,* 6 Haw.App. 409, 413, 723 P.2d 186, 189 (1986) (emphasis added). In other words, the plain language of the 1982 version of HRS § 706–668 provided no guidance to the sentencing court with respect to imposing consecutive sentences in the face of multiple offenses, thereby leaving the sentencing court's discretion virtually unfettered. The ABA Standards have strongly disapproved such seemingly limitless sentencing discretion because the

> fundamental principle of avoidance of unwarranted and inequitable disparities ... is seriously at risk if sentencing courts are not guided in the way they determine sentences for offenders who have committed more than one offense. Large differences in sentences imposed can and will result from [the] absence of meaningful guidance to sentencing courts [if] each sentencing judge is left to determine such matters in the court's unfettered discretion....

ABA Standards § 18–6.5 commentary at 232.

In 1986, as part of a wholesale revision of the HPC, the legislature filled the void created by the open-ended grant of judicial authority to impose consecutive sentences, as set forth in HRS § 706–668, by taking two significant steps. First, the legislature repealed HRS § 706–668 altogether, 1986 Haw. Sess.L. Act 314, § 46 at 614, and replaced it

with HRS § 706–668.5, *id.,* § 45 at 614. Second, the legislature revamped HRS § 706–606 by replacing its former subject matter—sentences for the offense of murder—with universal "[f]actors to be considered in imposing a sentence." *Id.,* § 15 at 599–600.

HRS § 706–668.5 (Supp.1992) provides:

**Multiple sentences of imprisonment.** (1) If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an unexpired term of imprisonment, the terms may run concurrently or consecutively. *Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms run concurrently.*

(2) *The court,* in determining whether the terms imposed are to be ordered to run concurrently or consecutively, *shall consider the factors set forth in section 706–606.*

(Emphasis added.)

HRS § 706–606 (Supp.1992) provides:

**Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed:

(a) To reflect the seriousness of the offense, to promote respect for law, and to provide *just punishment* for the offense; [33]

---

**33.** HRS § 706–606(2)(a) preponderantly reflects what has come to be known as the "retributivist" penal objective of "just punishment" or "just deserts." Its evolution, definition, and application have been traced by Professors von Hirsch and Ashworth:

> Retributivist theories of punishment have a long history which includes the writings of Kant and Hegel, but their revival in modern times can be traced to various philosophical writings in the 1960s.... This increased

philosophical interest percolated though into penal theory later in the 1970s—most notably, in the espousal of "just deserts"....

For present purposes, a desert theorist will be regarded as someone who claims that the seriousness of crimes should, on grounds of equity, be the chief determinant of the quantum of punishment....

In response to the ... question, Why punish? there appear to be at least two different approaches among modern desert theorists. One

(b) To afford adequate *deterrence* to criminal conduct; [34]

(c) To *protect the public* from further crimes of the defendant; [35] and

(d) To provide the defendant with needed *educational or vocational training, medical care, or other correctional treatment* in the most effective manner; [36]

(3) The kinds of sentences available; and

(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

(Emphasis added.)

The 1986 enactment of HRS § 706–668.5 and transformation of HRS § 706–606 thus

approach ... is essentially that those who commit crimes deserve to be punished for the same reason that those who commit civil wrongs deserve to be made to pay damages; there is a fundamental intuitive connection between crime and punishment, of the same order as the promissory theory of contract or the corrective theory of tort liability. Punishment as a practice or institution needs no further justification than this. The second approach, adopted in the writings of von Hirsch, regards this intuitive connection as only one element of the justification. Thus desert is an integral part of everyday judgments of praise and blame, and it is institutionalized in state punishment to express disapprobation of the conduct and its perpetrators. This is the censuring function of punishment. But the other element of von Hirsch's justification is preventive: legal punishment provides a disincentive against engaging in certain conduct. Without the regular official punishment of crimes, it seems likely that victimizing conduct would become so prevalent as to make life nasty and brutish, indeed. For von Hirsch, therefore, the notion of deserved censure is necessary but not sufficient as a justification. General deterrence must also be invoked.

A. von Hirsch and A. Ashworth, *Principled Sentencing* 181–82 (1992) [hereafter *Principled Sentencing*] .(footnotes and quotation marks omitted). *See generally* A. von Hirsch, *Censure and Sanctions* (1993).

Professors Morris and Tonry have described the disfunctionality of applying the extreme form of retributivism, pursuant to which "deserved punishment would be linked closely to the degree of moral misconduct expressed by the offender's actions and two identically culpable offenders would deserve identically severe punishments":

Matching punishments to desert cannot create an even marginally acceptable system of punishments; there can be no system of just deserts if like cases are to be treated alike. A punishment scheme that sought only desert plus equality would be intolerably severe. If all criminals are to be punished equally according to the harm they have knowingly achieved, Solzhenitsyn's gulag would seem like a country club. If intentional and legally unprovoked killings attract their deserved punishment, a punishment matching the harm encompassed, then we would have approximately 10,000 executions a year in the United States (a country which has never executed 200 in

any year). Likewise, white-collar criminals who have intentionally polluted the rivers and streams and atmosphere, or risked the lungs of their workers, would never properly be released from prison. The point is obvious: under a pure and equally applied system of just deserts, who escapes whipping?

*Between Prison and Probation* at 84, 105–06.

34. "Deterrence, as an aim of sentencing, is one of a cluster of forward-looking aims which may be termed preventive or consequentialist.... [D]eterrence and the other forward-looking aims may be subsumed beneath the overall aim of the reduction or prevention of crime." *Principled Sentencing* at 53.

35. HRS § 706–606(2)(c) reflects the penal objective of "incapacitation."

Incapacitation is the idea of simple restraint: rendering the convicted offender incapable, for a period of time, of offending again. Whereas rehabilitation involves changing the person's habits or attitudes so he or she becomes less criminally inclined, incapacitation presupposes no such change. Instead, obstacles are interposed to impede the person's carrying out whatever criminal inclinations he or she may have. Usually, the obstacle is the walls of a prison, but other incapacitative techniques are possible—such as exile or house arrest.

*Principled Sentencing* at 101. For the latest and probably most definitive empirical study of the relationship between incapacitation and crime reduction, *see* F. Zimring and G. Hawkins, *Incapacitation* (1995).

36. HRS § 706–606(2)(d) reflects the penal objective of "rehabilitation."

Rehabilitation ... consists ... of changing an offender's personality, outlook, habits, or opportunities so as to make him or her less inclined to commit crimes. Often rehabilitation is said to involve "helping" the offender, but a benefit to the offender is not necessarily presupposed: those who benefit are other persons, ourselves, who become less likely to be victimized by the offender. Traditionally, rehabilitation has consisted in offering counseling, psychological assistance, training, or support—but a variety of other techniques might be used. Some of these, such as aversive therapies, may be less than pleasant.

*Principled Sentencing* at 1 (footnote omitted).

influenced the sentencing discretion of the courts in at least two respects—one general and the other specific. As a general matter, when exercising its broad discretion to impose any particular sentence so as to fit the punishment to the offense as well as to the needs of the individual defendant and the community, the sentencing court became obligated to consider the HRS § 706–606 "factors" as part of its decision making process. *Valera,* 74 Haw. at 435–36 & n. 8, 848 P.2d at 381 & n. 8; *Lau,* 73 Haw. at 262, 831 P.2d at 525; *State v. Nunes,* 72 Haw. 521, 524–25 & n. 1, 824 P.2d 837, 839 & n. 1 (1992); *Kumukau,* 71 Haw. at 225 & n. 3, 787 P.2d at 686 & n. 3. But specifically, and by the plain language of HRS § 706–668.5(2)—although subject, pursuant to HRS § 706–668.5(1), to presumptively concurrent sentencing in connection with multiple prison terms "imposed at the same time"—, the sentencing court became obligated to "consider the factors set forth in [HRS §] 706–606" when determining whether multiple indeterminate prison terms were to run concurrently or consecutively.

Because the implementation of the HRS § 706–668.5 concurrent-versus-consecutive sentencing decision is umbilically connected to due consideration of the HRS § 706–606 "factors," it is critical to consider the broader context within which the statutory changes occurred in order to glean the legislature's intent in promulgating HRS § 706–606 in its transfigured form.

The statutory amendments at issue were merely two elements of an omnibus bill, Act 314, by which the legislature revisited the fundamental philosophy reflected in the HPC following a process of comprehensive review.

The purpose of [Act 314] is to update the [HPC] by incorporating certain recommendations of the Committee on Penal Code Revision and Reform of the Judicial Council of [Hawai'i].

It has been approximately twelve years since the penal code was enacted[,] during which time piecemeal amendments have been made to the code. The Committee on Penal Code Revision was appointed in 1983 to address the community's concern that the [HPC], adopted in 1973, required some adjustment in order to respond to current patterns of crime.... The committees's recommendations were published in a report entitled, "A Comprehensive Review and Reformation of the [Hawai'i] Penal Code." All the recommendations were not unanimously agreed to by all members and there was strong disagreement on certain recommendations. However, the report did attempt to synthesize the diverse perspectives of the committee into specific proposals.

[Act 314 effects] comprehensive amendments that would refine the penal code rather than [effect] widesweeping reform.

[Act 314] focuses on crimes against the person and against property as the most compelling areas for revision, since it is in these areas that the impact of crime is most felt. The penalties for substantive crimes were restructured to more precisely define various crimes in order to provide sentencing which *justly penalizes the crime committed.*

. . . .

The amendments to [chapter] 706, disposition of convicted defendants, demonstrate a *shift from the present approach of sentencing which emphasizes rehabilitation toward achieving the goal of just punishment.* The corresponding deletion of [the] section ... which requires the court to withhold imprisonment unless circumstances mandate otherwise, and the addition of a [revised] section, section 70[6]–606, outlining [factors] to be considered when imposing sentence, including *the need to afford deterrence and to provide just punishment,* establish a *different view of both incarceration and probation.*

Sen.Conf.Comm.Rep. No. 51–86, in 1986 Senate Journal, at 747–48 (emphasis added); Hse.Conf.Comm.Rep. No. 51–86, in 1986 House Journal, at 937–38 (emphasis added).

Thus, although HRS § 706–606(2) (Supp. 1992) mandates consideration of the four classic penal objectives—retribution/just punishment,[37] deterrence,[38] incapacitation,[39] and

---

37. *See supra* note 33.

38. *See supra* note 34.

39. *See supra* note 35.

rehabilitation[40]—, the legislature has declared unequivocally that sentencing courts are to implement HRS § 706–606 from the perspective that the general sentencing scheme set out in HRS ch. 706 has shifted from a pre–1986 emphasis on rehabilitation to a post–1986 overriding aspiration "to afford deterrence and to provide just punishment." This is precisely the retributive approach to "just deserts" advocated by Professor von Hirsch.[41]

■ Accordingly, the fact that HRS § 706–606 is incorporated by reference into HRS § 706–668.5 has profound significance. Bearing in mind that all indeterminate (including consecutive) prison terms are inherently incapacitative,[42] the legislative sentencing philosophy permeating HRS ch. 706 in general and HRS § 706–606 in particular dictates that discretionary consecutive prison sentences, pursuant to HRS § 706–668.5, may properly be imposed only if the penal objectives sought to be achieved include retribution (*i.e.*, "just deserts") and deterrence.[43] It therefore follows that the imposition of consecutive prison terms *solely* for extraneous reasons, and to a defendant's substantial detriment, constitutes a plain and manifest abuse of discretion. *See Valera*, 74 Haw. at 439, 848 P.2d at 383; *Kumukau*, 71 Haw. at 227–28, 787 P.2d at 688.

    b.  *The function of restitution within the Hawai'i Penal Code and the proper manner of its imposition*

A sentencing court's authority to order restitution or reparation[44] is codified in HRS § 706–605 (Supp.1992), which provides in relevant part:

**Authorized disposition of convicted defendants.** (1) Except as provided in parts II [Probation] and IV [Imprisonment] of this chapter and subsection (2) of this section[45] and subject to the applicable provisions of [the HPC], the court may sentence a convicted defendant to one or more of the following dispositions:

    . . . .

    (d) To make restitution in an amount the defendant can afford to pay; provided that if the court orders, in addition to restitution, payment of [a] fine . . ., the payment of restitution shall have priority over the payment of the fine[.]

In *State v. Murray*, 63 Haw. 12, 621 P.2d 334 (1980), this court traced the emergence of restitution as a recognized element of the Hawai'i criminal justice system.

Restitution or reparation in addition to imprisonment or fine as an optional penal sanction is a recent development in our correctional process, having been approved in 1975. However, the concept of an offender making restitution to his victim is ancient; its origins are traceable to primitive societies and to early codes which prescribed compensation for the victim, as well as punishment of the offender.

    . . . .

The emergence of centralized authority brought codes of justice with provisions for the restitution of victims by offenders. In England, an offender was compelled to pay "bot" to his victim; later, he also paid "wite" to the King. Eventually, the entire

---

**40.** *See supra* note 36.

**41.** *See supra* note 33.

**42.** *See supra* note 35.

**43.** *See* ABA Standard 18–3.12(a)(iii) ("Rehabilitation of offenders is an insufficient basis, standing alone, for imposition of a criminal sanction not otherwise justified, or for imposition of a more severe sentence than otherwise justified."); ABA Standard 18–6.4(b) ("A sentencing court should not select a sanction of total confinement . . . because of the offender's apparent need for rehabilitation or treatment."); ABA Standards § 18–6.4 commentary at 230 ("[R]ehabilitation of offenders is never a sufficient basis, standing alone,

for imposition of a criminal sanction that is not appropriate on other, independent grounds.").

**44.** " 'Reparation' is nowadays a generic term, denoting not only financial compensation but also 'restitution' (the return of property to its rightful owner) and the repair of criminal damage. What offenders usually offer, and what courts usually order, is financial compensation[.]" N. Walker, *Why Punish?* 155 n. 3 (1991) [hereafter *Why Punish?* ].

**45.** HRS § 706–605(2) (Supp.1992) provides that "[t]he court shall not sentence a defendant to probation and imprisonment except as authorized by part II of this chapter."

retributive payment or fine went to the ruler and the punishment of offenses that threatened the social fabric became the exclusive province of the state. Criminal law and its administration were divorced from civil law, and the restitution or reparation of victims of crimes, as well as the redress of essentially private wrongs, became the function of tort law.

Thus, the concept of victim restitution was not an integral component of American criminal justice.[46] However, we have witnessed a recent resurgence of interest in the plight of victims that has engendered proposals for an integration of the concept into the criminal process. The inefficacy of common law remedies in compelling the repair by offenders of the consequences of their anti-social behavior has induced legislative attempts to alleviate the problem through other means.... [47] [R]ecently, proposals to integrate restitution with penology to the extent of exacting restitution from incarcerated offenders have gained limited acceptance. We earlier noted the provision at issue that authorizes a sentencing court to compel incarcerated offenders to make restitution or reparation to their victims within the criminal process was approved in 1975.

*Id.* at 15–17, 621 P.2d at 336–38 (footnotes omitted).

The quintessentially compensatory nature of the restitution sanction impelled the *Murray* court to subject HRS § 706–605(1)(d) [48] to "careful examination." *Id.* at 17, 621 P.2d at 338. The *Murray* court first noted "the seeming contradiction between the imprisonment of an offender and the simultaneous exaction of money from him, the traditional separation of criminal and civil processes, and the novelty of the concept of restitution in modern criminal justice." *Id.* Next, the *Murray* court recognized that the use of restitution in the penal context had to be

> reconciled with other penological provisions and with the several acknowledged objectives of the criminal process, which are the rehabilitation of the offender, the protection of society through a neutralization or removal from the community [*i.e.*, incapacitation] of the dangerous offender, and the deterrence of further breaches of law, as well as retribution.

*Id.* (footnote omitted).

Thus, the *Murray* court turned its attention to the relevant legislative history underlying the restitutionary component of HRS § 706–605—specifically, "the committee reports issued in conjunction with [its] adoption"—in order to ascertain its purpose. *Id.* at 18–19, 621 P.2d at 339. The court's investigation yielded the following:

> The relevant report of the House Committee on Judiciary reads in part:
>
> > Reparation and/or restitution by wrongdoers to their victims is basic to justice and fair play. The penal system should not be excluded from this concept. Your Committee believes that by imposing the requirement that a criminal repay not only "society" but the person injured by the criminal's acts, society benefits not once, but twice. The victim of the crime not only receives reparation and restitution, but the criminal should develop or regain a degree of self[-]respect and pride in knowing that he or she righted, to as great a degree as possible, the wrong that he or she had committed.
>
> Hse.Stand.Comm.Rep. No. 425, in 1975 House Journal, at 1148.

**46.** "[R]estitution ... conflicts with traditional criminal justice goals and procedures. Sentencing occurs within a system dominated by the values of law enforcement, community protection, and punishment." J. Austen and B. Krisberg, "The Unmet Promise of Alternatives to Incarceration" (1982) (footnote omitted), *reprinted in Principled Sentencing* at 334. *See also* ABA Standards § 18–3.15 commentary at 111 (noting that "restitution sanction" is of "quasi-civil character").

**47.** "Reparation ... [i]n strict legal theory ... is the task of civil courts; but civil suits are so expensive, and delay payments so seriously, that western courts are allowed to impose compensation on offenders." *Why Punish?* at 113.

**48.** At the time the *Murray* decision was handed down, the "authorized disposition" of "restitution or reparation to the victim or victims of the [defendant's] crimes" was codified in HRS § 706–605(1)(e).

The relevant report of the Senate Committee on Judiciary reads in part:

> Your Committee finds that in the criminal justice system, the victim of crime is almost always neglected. By requiring the "convicted person" to make restitution and reparation to the victim, justice is served. In so doing, the criminal repays not only "society" but the person injured by the criminal's acts. There is a dual benefit to this concept: The victim is repaid for his loss and the criminal may develop a degree of self-respect and pride in knowing that he or she has righted the wrong committed.

Sen.Stand.Comm.Rep. No. 789, in 1975 Senate Journal, at 1132.

*Id.* at 19 n. 11, 621 P.2d at 339 n. 11. Based on the foregoing legislative history, the *Murray* court inferred that the insertion of restitution into HRS § 706–605 had a "purpose and design that encompass the punishment and the rehabilitation of the offender." *Id.* at 19, 621 P.2d at 339.

We agree with the *Murray* court's inference in part and disagree in part. Restitution clearly has a rehabilitative component. Insofar as it is calculated to develop in the offender "a degree of self-respect and pride in knowing that he or she has righted the wrong committed," Sen.Stand.Comm.Rep. No. 789, in 1975 Senate Journal, at 1132, *supra*, restitution tends to affect "an offender's personality, outlook, [and] habits . . . so as to make him or her less inclined to commit crimes." *See* A. von Hirsch and A. Ashworth, *Principled Sentencing* 1 (1992) [hereafter *Principled Sentencing*], *supra* note 36.

But in concluding that restitution encompasses "the punishment . . . of the offender," we believe that the *Murray* court blurred the distinction between criminal fines, which are generally authorized by HRS § 706–605(1)(b) (Supp.1992), and restitution. A fine, as the *Murray* court itself recognized, is a *"retributive* payment" due the sovereign. *Murray*, 63 Haw. at 16, 621 P.2d at 337 (emphasis added). "When used appropriately, fines . . . advance *punitive* objectives[.]" ABA Standards § 18–3.16 commentary at 114 (emphasis added). "Whether one thinks of *punish-*

*ments* in deterrent terms, with the economists, or in retributive terms, with the philosophers, there can in principle be no reason why the fine cannot serve as a credible *punishment* for nontrivial, indeed serious crimes." N. Morris and M. Tonry, *Between Prison and Probation* 112 (1990) (emphasis added). Thus, a fine punishes the offender financially but does not make the victim whole.

Restitution, on the other hand, is "compensation for the victim" as an *adjunct* of "punishment of the offender," *Murray*, 63 Haw. at 15, 621 P.2d at 337, which is designed, as far as possible, to make the victim whole. Conflicting, as it does, "with traditional criminal justice goals and procedures," *Principled Sentencing* at 334, *supra* note 46, restitution is "quasi-civil," ABA Standards § 18–3.15 commentary at 111, *supra* note 46, and "[i]n strict legal theory . . . is the task of civil courts." N. Walker, *Why Punish?* 113 (1991), *supra* note 47.

It therefore follows that, in the criminal justice context, restitution is to a fine as, in the civil context, compensatory damages are to punitive damages.

Although statutorily authorized by HRS § 706–605(1)(d), a sentencing court's discretion to order restitution is not boundless. "Advocates of criminal restitution are convinced [that] it is not necessarily incompatible with the incarceration of offenders. And we concur. However, even the supporters of the concept acknowledge [that] its implementation is fraught with difficulty, primarily because incarceration normally entails a concomitant loss of earning capacity." *Murray*, 63 Haw. at 24, 621 P.2d at 342 (citations omitted).

For this reason, among others, HRS § 706–605(1)(d) limits restitution orders to "an amount the defendant can afford to pay." *See State v. Johnson*, 68 Haw. 292, 297, 711 P.2d 1295, 1299 (1985); *Murray*, 63 Haw. at 25, 621 P.2d at 343. In this connection, and despite the fact that the sentencing court "may delegate to the Adult Probation Division the function of making recommendations . . . on the amount of restitution and the manner of payment, the court has the

exclusive responsibility and function of imposing a sentence." *Johnson,* 68 Haw. at 297, 711 P.2d at 1299. Thus, "requisite specificity should be provided by the sentencing court and ought not be left to subsequent administrative determination," *Murray,* 63 Haw. at 25, 621 P.2d at 343 (citations omitted), because "[w]ithout express legislative authority, the court cannot delegate the sentencing function to another person or entity." *Johnson,* 68 Haw. at 297, 711 P.2d at 1299. *Cf. United States v. Porter,* 41 F.3d 68, 71 (2d Cir.1994) (sentencing court cannot delegate to probation department, either as to amount or scheduling of installment payments, judicial functions inherent in grant of restitution); *United States v. Weichert,* 836 F.2d 769, 772 (2d Cir.1988) (sentencing court may not authorize probation officer to make post-sentencing decision as to amount of restitution), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 802 (1989); *United States v. Ahmad,* 2 F.3d 245, 248–49 (7th Cir.1993) (sentencing court may not authorize probation officer to make post-sentencing decision as to scheduling of installment payments).[49] Accordingly, "it is incumbent upon the [sentencing] court to enter into the record findings of fact and conclusions that the manner of payment is reasonable and one which [the defendant] can afford." *Johnson,* 68 Haw. at 297–98, 711 P.2d at 1299.[50]

**49.** We respectfully disagree with *United States v. Signori,* 844 F.2d 635 (9th Cir.1988), and *United States v. Barany,* 884 F.2d 1255 (9th Cir.1989), cited in the Concurring and Dissenting Opinion at 1 n. 1.

**50.** The concurring and dissenting opinion agrees that HRS § 706–605(1)(d) imposes upon the sentencing court "the exclusive responsibility and function of determining the amount of restitution," concurring and dissenting opinion at 1, and acknowledges that the sentencing court does so by "taking into consideration the defendant's circumstances known to the court at the time the sentence is imposed." *Id.* at 4. Nevertheless, the opinion asserts that "the manner of payment is not a determination that is expressly reserved for the sentencing court." *Id.* at 1. We simply do not follow the logic of the concurring and dissenting opinion. Presumably, the sentencing court's conceded "exclusive responsibility and function" derives from the statutory phrase, "in an amount the defendant can afford to pay," set forth in HRS § 706–605(1)(d). It seems intuitively obvious to us that a sentencing court *cannot* determine restitution "in an amount the defendant can afford to pay" without determining the manner of payment.

It should be emphasized that under existing law, sentencing courts retain supervisory jurisdiction over defendants subject to restitution orders—both as to amount and manner of payment. HRS § 706–644 (Supp.1992) provides in relevant part:

> **Consequences of nonpayment; imprisonment for contumacious nonpayment; summary collection.** (1) When a defendant sentenced to pay a fine *or restitution* defaults in the payment thereof or of any installment, the court, upon the motion of the prosecuting attorney or upon its own motion, may require the defendant to show cause why the defendant's default should not be treated as contumacious and may issue a summons or a warrant of arrest for the defendant's appearance. Unless the defendant shows that the defendant's default was not attributable to an intentional refusal to obey the order of the court, or to a failure on the defendant's part to make a good faith effort to obtain the funds required for the payment, the court shall find that the defendant's default was contumacious and may order the defendant committed until the fine, *restitution,* or a specified part thereof is paid.
>
> . . . .
>
> (4) If it appears that the defendant's default in the payment of a fine *or restitution* is not contumacious, the court may make an order allowing the defendant additional time for payment, reducing the amount thereof or of each installment, or revoking the fine *or restitution* or the unpaid portion thereof in whole or in part.
>
> (5) Upon any contumacious default in the payment of a fine *or restitution* or any installment thereof, execution may be levied and such other measures may be taken for the collection of the fine, *or restitution,* or the unpaid balance thereof as are authorized for the collection of an unpaid civil judgment entered against the defendant in an action on a debt. The levy of execution for the collection of a fine *or restitution* shall not discharge a defendant committed to imprisonment for nonpayment of the fine *or restitution* until the amount of the fine *or restitution* has actually been collected or accounted for....

HRS § 706–645 (Supp.1992) provides:

> **Revocation of fine *or restitution.*** (1) A defendant who has been sentenced to pay a fine *or restitution* and who is not in contumacious default in the payment thereof may at any time petition the court which sentenced the defendant for a revocation of the fine *or restitution* or of any unpaid portion thereof.
>
> (2) If it appears to the satisfaction of the court that the circumstances which warranted the imposition of the fine *or restitution* have changed, or that it would otherwise be unjust to require payment, the court may revoke the fine *or restitution* or the unpaid portion thereof

154

Finally, because the penal justification for the "quasi-civil" compensatory sanction of restitution is rehabilitative, we emphasize that rehabilitation, standing alone, is an insufficient basis for the imposition of a prison term that is not appropriate on other independent grounds. ABA Standard 18–6.4(b); ABA Standards § 18–6.4 commentary at 230 (*see supra* note 43). Correlatively, "[u]nder prevailing constitutional law, courts may not impose total confinement [*i.e.*, imprisonment] in response to nonpayment resulting from [present] inability to pay [restitution]. *Bearden v. Georgia*, 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983)." ABA Standards § 18–3.15 commentary at 112 n. 17. But because "an order of restitution or reparation [is] available as a free-standing sanction, to be imposed alone or in combination with other sanctions," including imprisonment, *id.* at 109; HRS § 706–605, we also emphasize that "[r]ehabilitation of offenders is an insufficient basis, standing alone, ... for imposition of a *more severe sentence than otherwise justified.*" ABA Standard 18–3.12(a)(iii), *supra* note 43 (emphasis added).

### 3. *Application of general principles to Gaylord's appeal*

As we have indicated, Gaylord concedes for present purposes that the sentencing court had the authority to sentence him to indeterminate prison terms. *See supra* note 27. In any event, given the court's express finding that to sentence Gaylord to probation would fail to reflect the seriousness of his offenses and provide appropriate punishment, *see supra* at 11, 14, it is apparent

that the sentencing court acted well within its discretion in imposing indeterminate terms of imprisonment as a consequence of Gaylord's theft convictions. HRS §§ 706–606(1) and (2)(a).

However, on the record before us, it is equally apparent, and we so hold, that the sentencing court's imposition of consecutive prison terms, pursuant to HRS § 706–668.5, constituted an abuse of discretion. In accordance with the analysis set forth in section II.B.2.a of this opinion, the legislative sentencing philosophy permeating HRS ch. 706 in general and HRS § 706–606 in particular dictates that consecutive prison sentences, pursuant to HRS § 706–668.5, may properly be imposed only to achieve retributive, incapacitative, and deterrent objectives. Thus, at the very least, (1) the sentencing court must expressly intend that the defendant's period of incarceration be *prolonged* by virtue of the consecutive character of the prison terms (the retributive goal), and (2) the sentence must embody the forward-looking aim of *future* crime reduction or prevention (the deterrent goal). *See supra* notes, 33, 34, and 35.

In this case, the sentencing court left no room for doubt, in imposing consecutive terms of incarceration, that it expressly did *not* intend for Gaylord to serve *any* enhanced or extended prison time, but rather that its *sole* purpose was to maximize the supervisory power of the Hawai'i Paroling Authority over Gaylord in an attempt to facilitate the collection of the court-ordered restitution. *See supra* at 12–13.[51] In accordance with the analysis set forth in section II.B.2.b

---

in whole or in part. *Prior to revocation, the court shall afford the prosecuting attorney an opportunity to be heard.*

(Underscored material in both sections added by 1986 Haw.Sess.L.Act 314, §§ 36 and 37 at 610–11.)

Thus, consistent with the sentencing function of making the initial determinations of restitutionary amounts and their manner of payment, *see Johnson*, 68 Haw. at 297, 711 P.2d at 1299, the courts have the statutory authority to alter, amend, or revoke restitution orders on the basis of unforseen or changed circumstances and to impose consequences upon defendants who fail unjustifiably to discharge their obligations thereunder.

51. We note that sentencing courts have no power to dictate parole decisions of the Hawai'i Paroling Authority nor to supervise the performance of its duties with respect to the collection of restitution or otherwise. *See* HRS §§ 353–62 (1985 & Supp.1992), 353–64 (Supp.1992 & Comp.1993), 353–65 (1985 & Supp.1992), 353–66 (Supp.1992), 353–67 (1985), 353–68 (1985), 353–69 (1985), 353–70 (1985), 706–669 (1985 & Supp.1992), 706–670 (1985 & Supp.1992 & Comp.1993). Thus, the only certainty created by the court's consecutive sentencing decision in this case was to prolong Gaylord's period of actual incarceration, during which time he could not be released on supervised parole, thereby impeding the compensatory and rehabilitative purposes of its restitution order.

of this opinion, the dual objectives of restitution are (1) quasi-civil compensation and (2) rehabilitation. Given the legislative history of the HPC, these objectives, standing alone, cannot support the imposition of consecutive sentencing pursuant to HRS §§ 706–606 and 706–668.5. *Cf.* ABA Standards 18–3.12(a)(iii) and 18–6.4(b), *supra* note 43. Moreover, we agree with Gaylord that the record before us compels the inference that Gaylord was sentenced to consecutive terms of imprisonment because of his present inability to pay full restitution, contrary to the mandate of *Bearden v. Georgia, supra.*

▪ In addition, we hold that the sentencing court's restitution order failed to comply with HRS § 706–605(1)(d) and was illegally imposed. In disregard of *Johnson,* 68 Haw. at 297–98, 711 P.2d at 1299, the sentencing court failed to make any finding that $122,248.95 was an amount that Gaylord could afford to pay in restitution (indeed, as noted, the sentencing court viewed Gaylord's "sources of restitution" as "highly unlikely and highly speculative and unreliable") and to prescribe the manner of payment. To compound the error, in its December 13, 1991 judgment of conviction, the sentencing court expressly and improperly delegated the judicial function of determining the manner of payment to an administrative body—the Hawai'i Paroling Authority. *Johnson,* 68 Haw. at 297, 711 P.2d at 1299; *Murray,* 63 Haw. at 25, 621 P.2d at 343.

### III. *CONCLUSION*

For the foregoing reasons, we affirm Gaylord's amended judgment of conviction, vacate his amended sentence, and remand the matter to the circuit court for resentencing consistent with this opinion.

1. The Ninth Circuit is in accord with this view. *See, e.g., United States v. Signori,* 844 F.2d 635 (9th Cir.1988) (holding that the district court was entitled to permit probation department to determine timing and manner of restitution payments); *United States v. Barany,* 884 F.2d 1255 (9th Cir.1989) ("[T]he court may delegate questions concerning the defendant's ability to pay and the timing and manner of payment to the probation officer[.]").

NAKAYAMA, Justice, concurring and dissenting.

I concur in the majority opinion except as to part II.B.2.b. Because I believe that a sentencing court does not have the "exclusive responsibility" of determining the manner of payment of restitution, I respectfully dissent from part II.B.2.b.

Although I agree that, pursuant to Hawai'i Revised Statutes (HRS) § 706–605(1)(d) (Supp.1992), the sentencing court has the exclusive responsibility and function of determining the amount of restitution, I believe the manner of payment is not a determination that is expressly reserved for the sentencing court.[1]

While the majority requires "express legislative authority" before allowing a sentencing court to delegate the responsibility of determining the "manner of payment," it points to no "express legislative authority" mandating that the responsibility of determining the manner of payment rests exclusively with the sentencing court. Indeed, HRS § 706–605(1)(d) makes no mention of "manner of payment," and for good reason. Once the amount of restitution is set by the sentencing court, the "manner of payment" is nothing more than a ministerial function better left to the Adult Probation Division or the Paroling Authority. At the time restitution is paid or due, the Adult Probation Division or the Paroling Authority is in the best position to schedule payments, collect payments, and forward the amounts collected to the appropriate party. Surely the statute does not mandate the court's involvement in the process beyond imposing a fair and just amount of restitution. Once the court properly sentences the defendant to pay restitution, determining the "manner of payment" does not necessarily implicate a judicial function.[2]

2. The majority notes that HRS § 706–644 and § 706–645 are "consistent with the sentencing function of making the initial determinations of restitutionary amounts and their manner of payment[.]" Majority at 55 n. 54. I agree. My contention, however, is not that the sentencing court lacks the authority to determine the manner of payment, but rather, that HRS § 706–605(1)(d) does not prohibit the sentencing court from delegating this authority. Citation to HRS § 706–644 and § 706–645, then, does little to

The majority opinion relies on two cases from this jurisdiction for the proposition that a sentencing court has the exclusive responsibility for determining the amount of restitution as well as the manner of payment. However, nothing in the majority opinion convinces me that these cases were correct.

The first case, *State v. Murray*, states that "[a] defendant must be apprised of 'what is required of him, and when it is required, so that he will know when he is in default.'" 63 Haw. 12, 25, 621 P.2d 334, 343 (1980) (quoting *State v. Calderilla*, 34 Or.App. 1007, 1010, 580 P.2d 578, 579 (1978)). The *Calderilla* case this court relied on in *Murray*, however, involved the situation where the sentencing court failed to determine the manner of payment *and* failed to have a subsequent administrative agency determine the manner of payment. The deficiency in the sentence, then, was that the manner of payment had not been determined at *any time*.

This court in *Murray* also cited *Mason v. State*, 46 Md.App. 1, 9, 415 A.2d 315, 319 (1980), and *Kroenke v. State*, 366 So.2d 46 (Fla.Dist.Ct.App.1979) as examples for the proposition that "[t]he requisite specificity should be provided by the sentencing court and ought not be left to subsequent administrative determination." *Murray*, 63 Haw. at 25, 621 P.2d at 343. However, this court's reliance on those two cases was misplaced. In *Mason*, the court issued an open-ended order for the defendant to make additional restitution to a wide variety of "victims" to be determined by the probation department and in *amounts* to be determined by the probation department. In *Kroenke*, the court delegated to the defendant's probation supervisor the authority to determine the *amount* of restitution. This violated state law that mandated notice and an opportunity to be heard as to the amount of restitution. Therefore, the requisite specificity lacking in *Mason* and *Kroenke* was not the manner of payment, but rather the amount of payment. Because the *Mason* and *Kroenke* decisions

did not specifically preclude a subsequent administrative determination as to manner of payment, I interpret the holding of those two cases as consistent with HRS § 706–605(1)(d) in that a sentencing court must determine the amount of restitution and cannot delegate this determination to a subsequent administrative agency.

The other case relied on by the majority, *State v. Johnson*, 68 Haw. 292, 711 P.2d 1295 (1985), is similarly unpersuasive. The *Johnson* court's reference to "manner of payment" is nothing more than a judicial gloss imposed on an otherwise clear statute.

In my view, the sentencing court discharges its obligation to impose a sentence by establishing the amount of restitution, taking into consideration the defendant's circumstances known to the court at the time the sentence is imposed. Once the sentencing court has properly determined the amount of restitution that the defendant can "afford to pay," it has imposed a sentence with the "requisite specificity." In many cases, the defendant will actually begin payment of the restitution at the end of a term of imprisonment. To require a sentencing court to predict the precise financial capabilities of a defendant five, ten, or even twenty years in the future ignores the practical realities facing a sentencing court. While it is possible for the sentencing court to predict a defendant's general financial circumstances and thereby determine how much a defendant can afford to pay, the payment schedule and terms of payment are difficult, if not impossible, for a sentencing court to properly determine at the time of sentencing. Therefore, the manner of payment is often times better left to a subsequent administrative determination.

To the extent that *Johnson* and *Murray* prevent the sentencing court from delegating the determination of the manner of payment to the Adult Probation Division or the Paroling Authority, I would overrule them. There

---

demonstrate that the sentencing court is precluded from exercising this option. Indeed, these two statutes make no mention of the fact that delegation of the authority to determine the manner of payment will divest the sentencing court of supervisory jurisdiction over defendants subject

to restitution. As such, allowing the Adult Probation Division or the Paroling Authority to determine the manner of payment is not inconsistent with the sentencing court having concurrent supervisory jurisdiction.

is no doubt that a defendant must be apprised of how much restitution he or she must pay, and when he or she must pay it. However, because: (1) I believe that the Adult Probation Division or the Paroling Authority is in a better position to determine the manner of payment; and (2) our case law establishing that the sentencing court has the exclusive responsibility of determining the manner of payment was wrongly decided, I would hold that a sentencing court, while required to determine the amount of restitution, may authorize a subsequent administrative agency to determine the manner of payment. In my view, allowing this practice does not violate the mandates of HRS § 706–605(1)(d) and provides a more practical and efficient approach to a sentence of restitution.